Paul Carlos Southwick (ISB No. 12439)
Emily Myrei Croston (ISB No. 12389)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
psouthwick@acluidaho.org
ecroston@acluidaho.org

Joanna Cuevas Ingram*
Kevin Siegel*
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 34573
Washington, D.C. 20043
Tel: (213) 639-3900
cuevasingram@nilc.org
siegel@nilc.org

Tanya Broder*
NATIONAL IMMIGRATION LAW
CENTER
3450 Wilshire Blvd. No. 108-62
Los Angeles, CA 90010
Tel: (213) 639-3900
broder@nilc.org

Seth D. Levy (ISB No. 10703)
Vincent C. Capati*
Jacqueline D. Relatores*
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA  90071-3151
Tel: (213) 629-6000
slevy@nixonpeabody.com
vcapati@nixonpeabody.com
jrelatores@nixonpeabody.com

Brian J. Whittaker*
NIXON PEABODY LLP
799 Ninth Street, N.W., Suite 500
Washington, D.C. 20001
Tel: (202) 585-8000
bwhittaker@nixonpeabody.com

Nikki Ramirez-Smith (ISB No. 9030)
Casey Parsons (ISB No. 11323)
Talia Burnett*
Neal Dougherty*
RAMIREZ-SMITH LAW
444 W. Iowa Ave.
Nampa, ID 83686
Tel: (208) 461-1883
nsmith@nrsdt.com
cparsons@nrsdt.com
tburnett@nrsdt.com
ndougherty@nrsdt.com

*Motion for *pro hac vice* admission forthcoming
*Attorneys for Plaintiffs (additional counsel identified on the following page)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ABBY DAVIDS, MD, K.P., N.R., F.F., J.A.O.G., and JOHN DOE,<br>              *Plaintiffs*,<br><br>                        v.<br><br>ALEX ADAMS, in his official capacity as Director of the Idaho Department of Health and Welfare, MIREN UNSWORTH in her official | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

capacity as the Deputy Director of IDHW in
charge of Health & Human Services, ELKE
SHAW-TULLOCH in her official capacity as
the administrator of IDHW's Division of Public
Health, ANGIE BAILEY as the Director of the
Idaho Bureau of Rural Health & Primary Care, ,
RAÚL LABRADOR in his official capacity as
the Attorney General of Idaho,

                    *Defendants*.

Alvaro Cure Dominguez*
NIXON PEABODY LLP
70 West Madison, Suite 5200
Chicago, IL 60602-4378
Tel: (312) 977-4400
acuredominguez@nixonpeabody.com

Plaintiffs Dr. Abby Davids, K.P., N.R., F.F., J.A.O.G., and John Doe ("Plaintiffs")[1], by and through their attorneys, bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure, and allege as follows:

**INTRODUCTION**

This action challenges House Bill 135 ("H.B. 135"), amending Idaho Code §§ 56-203; 67-7903, and the Idaho Department of Health and Welfare's ("IDHW") decision to impose immigration status verification requirements on beneficiaries of certain federally-funded public programs. The action is brought on behalf of a class that would include all current and future persons who otherwise qualify for federally-funded services through the Ryan White Comprehensive AIDS Resources Emergency (CARE) Act HIV/AIDS Program ("Ryan White") and Part B AIDS Drug Assistance Program ("ADAP") (hereinafter, "the Class") who will be unable to provide proof of immigration status sufficient to receive federally-funded Ryan White services due to Idaho H.B. 135, and IDHW's interpretation and application of H.B. 135.

1. H.B. 135 violates the Supremacy Clause of the United States Constitution. Immigration is a quintessentially federal authority. The power to categorize immigrants and regulate the entry, movement, and residence of noncitizens is reserved for the federal government. Further, Congress exercised this power in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA") to occupy the field of noncitizen eligibility and verification for federal public benefits and federally-funded public benefits programs.

---

[1] Plaintiffs other than Dr. Abby Davids have concurrently filed a motion for leave to proceed pseudonymously.

2.     H.B. 135 is contrary to federal law. It purports to govern the availability of federally-funded programs for categories of noncitizens and individuals unable to prove citizenship in direct conflict with PRWORA and the other federal statutes governing these programs.

3.     Further, H.B. 135 by its terms affects only programs that are "federal public benefits" or "state and local public benefits" under federal law. None of the programs IDHW is subjecting to H.B. 135 fall within either of these definitions. IDHW's decision to cut off benefits for individuals otherwise eligible for these programs without notice, comment, grace periods, or federal agency approval violates Procedural Due Process.

4.     H.B. 135 also violates the Equal Protection Clause of the Fourteenth Amendment to the United Constitution. The statute breaks with the federal statutory and regulatory scheme and independently regulates access to public services based solely on immigration status. State statutes that discriminate based on alienage are subject to intermediate scrutiny, which H.B. 135 fails.

5.     Plaintiffs seek declaratory and permanent injunctive relief. Plaintiffs will seek a temporary restraining order and a preliminary injunction to enjoin enforcement of H.B. 135 immediately.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7.     Venue is proper in the District of Idaho because a substantial portion of the relevant events occurred or will occur in the District. 28 U.S.C. § 1391(b). Defendants are sued in their official capacities. Each Defendant resides within the State of Idaho.

8.     The Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

## PARTIES

### A. Plaintiffs

9.  <u>PLAINTIFF ABBY DAVIDS, MD</u> is a citizen of the United States and a resident of Idaho. She is the Program Director of the Boise Family Medicine Residency and the previous Fellowship Director of the HIV & Viral Hepatitis Fellowship at Full Circle Health. She joins this case in her individual capacity and not as a representative of Full Circle Health.

10. Dr. Davids is a broad-spectrum family physician who sees patients in the clinic, works in the hospital, and delivers babies. Her clinical expertise lies in the care of newly arrived immigrants and refugees; the care of people living with human immunodeficiency virus ("HIV"), viral hepatitis, and tuberculosis ("TB"); and the intersection of infectious disease, public health, and primary care. While in medical school, she developed an interest in caring for global populations, and treatment for people living with HIV. As part of her training, she cared for children in Ethiopia who were double orphans of HIV and living with HIV themselves. Witnessing the devastation that untreated HIV has on families and children in Ethiopia inspired her to care for HIV+ patients. She started at Full Circle Health as a Fellow in the HIV & Viral Hepatitis Fellowship in 2014, and she has practiced at Full Circle Health in various roles since that time.

11. Full Circle Health serves approximately 890 HIV+ patients. Dr. Davids sees about 100 patients of her own currently and provides cross coverage care for patients assigned to other HIV providers. Of the more than 890 HIV+ patients, approximately 175 are immigrants with a variety of immigration statuses. The clinic serves approximately 45 HIV+ patients who are currently undocumented. The clinic serves around an additional 20 patients whose immigration statuses put them at risk of failing H.B. 135's verification requirements. They are at risk because the

statute does not say whether their status would be considered "lawfully present" and/or because they lack a social security number. These uncertain statuses include patients with pending applications for asylum who have an employment authorization document ("EAD"), which is a temporary work permit, patients who are DACA recipients (Deferred Action for Childhood Arrivals), and patients who have a student visa but no work permit. Consequently, more than 60 patients at the clinic risk losing access to HIV medication because of H.B. 135.

12.    Of these patients, Dr. Davids personally cares for approximately 10. If H.B. 135's verification requirements go into effect, she will lose the ability to provide comprehensive HIV care for these patients, which represent about 10% of her patients with HIV. The clinic's patients include heterosexual men and women, including people who are pregnant and people from the LGBTQ+ community. One of her recent patients is a pregnant woman who is undocumented and living with HIV. Without treatment, HIV can be transmitted from mother to child.

13.    The more than 60 patients who risk losing access to their HIV medications all receive their medications from the clinic for free through Ryan White/ADAP, which provides funding for FDA-approved medications to low-income people with HIV. These people have limited or no health insurance.

14.    IDHW administers the Ryan White/ADAP program in Idaho.

15.    On April 16, 2025, IDHW informed the Ryan White/ADAP medical case managers that H.B. 135 may require them to verify the immigration status of patients accessing HIV treatment through the Ryan White/ADAP program.  The meeting notes state that medical case managers "can continue to provide services to undocumented clients until July 1, 2025." Starting May 6, 2025, Dr. Davids, and others at Full Circle Health, repeatedly asked IDHW to confirm whether H.B. 135 would affect their Ryan White/ADAP patients, and, if so, how the new law would be

implemented, including which immigration statuses would satisfy the requirements. As of May

29, 2025, IDHW did not provide any guidance. On May 30, 2025, IDHW informed Dr. Davids

that per H.B. 135, lawful presence will need to be verified for individuals applying to participate

in Ryan White/ADAP. That same day, she informed IDHW that "[w]e will need specific

guidance about what types of verification you will accept and which immigration statuses will be

deemed to be lawful. We will also need to know when this goes into effect and the expected

timeline to provide this information for all current ADAP participants."

16.     On June 4, 2025, IDHW held a meeting where they explained their decision to require

immigration status verification for the Ryan White/ADAP program. However, her understanding

is that they did not answer the clinic's questions about timeline or whether statuses other than

U.S. citizen, green card holder, refugee, or asylee would be considered lawfully present. For

example, they did not provide guidance as to eligibility for people who have pending asylum

applications and temporary work permits, DACA recipients, or people with student visas.

17.     As of June 24, 2025, Dr. Davids had not received the guidance she requested.

18.     When Dr. Davids meets with patients, she informs them about the Ryan White/ADAP

program as a way to access HIV medications that they would otherwise be unable to afford. She

advises her patients about the eligibility requirements.

19.     Before H.B. 135, immigration status did not render patients ineligible for the program.

According to IDHW's Idaho Ryan White Part B Policy, a person must be an Idaho resident to

enroll in Ryan White/ADAP. However, the Policy states that "Per HRSA PCN 21-02,

Immigration status is irrelevant for the purposes of eligibility for [Ryan White/ADAP] services."

However, because of H.B. 135, Dr. Davids is now required to advise her patients of the

immigration status verification requirements for the Ryan White/ADAP program. She may also be required to verify their immigration status in order to keep them on Ryan White/ADAP.

20.    Some of the verification requirements are vague and confusing to Dr. Davids, including the meaning of "lawfully present," so she doesn't know how to properly advise her patients. She has sought guidance from IDHW on these issues, but they have not provided guidance to her or the clinic. She is not an immigration attorney and cannot give legal advice to her patients. If her patients verify that they are lawfully present in Idaho in order to stay in the Ryan White/ADAP program, but the State of Idaho determines that they are not lawfully present here, her patients could be criminally liable. This possibility frustrates her ability to serve her patients and causes her, and them, significant anxiety.

21.    Moreover, Dr. Davids still does not know when or how the state will start imposing the immigration status verification requirements. The law is effective on July 1, 2025, but, despite repeated requests for guidance, she has not been told by IDHW whether verification will be required on July 1, at the time of their next medication refill, at the time of their reenrollment, which occurs every six months, or only for new enrollees. This lack of guidance on implementation makes it impossible for her patients and her to know when their medication will run out, which causes significant stress and anxiety for her patients and herself. IDHW also has not informed her as to whether or how the clinic needs to perform the immigration status verification, or if the verification will be handled exclusively by IDHW.

22.    HIV interferes with the body's ability to fight infection and disease by damaging the immune system. The HIV medications provided by the Ryan White/ADAP program are life-saving medications for her patients. They are highly effective at suppressing the virus to the point that it becomes undetectable and untransmittable.

23.    Because of highly effective treatments, HIV is no longer a death sentence. However, if Dr. Davids's patients lose access to their HIV treatment, the impact on their health will be devastating. HIV is universally fatal without treatment. There is no cure for HIV. It results in a slow death process. If her patients' medications are terminated, the virus will start attacking their immune cells again, which will quickly put them at a higher risk for infections, cancer, heart attacks, and strokes. The increased risk of infections includes highly deadly infections that people with a typical immune system do not experience. This includes infections like pneumocystis pneumonia, cryptococcal meningitis, Kaposi sarcoma, mycobacterium avium complex, cytomegalovirus, toxoplasmosis, and visceral leishmaniasis – all life-threatening conditions for people with HIV/AIDS.

24.    Left untreated, Dr. Davids's patients will eventually be diagnosed with acquired immune deficiency syndrome ("AIDS"). AIDS is a chronic, life-threatening condition caused by HIV. It is the late stage of HIV infection and is a terminal condition without treatment.

25.    In addition to HIV medications, the Ryan White/ADAP program pays for other medications her patients need, including medications that prevent serious infections (some people need these in addition to antiretroviral therapy ("ART")) and those that treat diabetes, high blood pressure, asthma and other conditions. People living with HIV generally have a higher risk of chronic diseases.

26.    Withdrawing HIV treatment from her patients will not only have devastating consequences on their health, it raises the public health risk of increased HIV transmission. When her patients are undetectable, they cannot transmit the virus. Without HIV treatment, however, they cannot maintain an undetectable viral level and therefore are able to transmit the virus to others. In the United States, universal HIV treatment is provided both to treat individual

patients and to stop transmission, and it has been very effective. Ending universal HIV treatment will result in increased transmission of the virus. This increase in transmission will include maternal to child transmission. Denying access to ART will make Idaho one of the worst places for HIV treatment and prevention in the world.

27.    On June 18, 2025, Dr. Davids received a letter from Elke Shaw-Tulloch, MHS, Administrator, Division of Public Health at IDHW. Pursuant to the Letter, "[O]n and after July 1, 2025, recipients of Ryan White benefits must meet the lawful presence criteria outlined in the law."

28.    PLAINTIFF K.P. is an adult citizen of Colombia. She lives in Idaho with her husband, N.R. She and her husband have been together for fifteen years. They have a daughter who is a year and a half. Their daughter is a U.S. citizen.

29.    In April of 2019, K.P. and her husband came to Idaho on tourist visas. They have been residents of Idaho ever since. Their tourist visas expired because they stayed longer than the six months permitted by the visas. They came to Idaho because they have family here.

30.    K.P. does not work outside of the home. She does not have any health insurance.

31.    K.P. applied for asylum in 2024. Her asylum application remains pending. She has an EAD, which is a temporary work permit related to her asylum application. She is not a refugee, lawful permanent resident, or Green Card holder.

32.    K.P. fears that her asylum application and EAD are not sufficient to satisfy the immigration status verification requirements of H.B. 135. To complete the immigration status verification procedure, she must attest, under oath, that she is "lawfully present in the United States pursuant to federal law." She does not know whether the State of Idaho considers her to be lawfully present in the United States pursuant to federal law.

33.     H.B. 135 does not say whether her immigration status qualifies as lawful presence for purposes of the new law. The State of Idaho has not provided guidance on whether K.P.'s immigration status would satisfy the requirements. If she says that she is lawfully present, but the State of Idaho decides that she is not lawfully present, then she may be guilty of a misdemeanor.

34.     K.P. was diagnosed with HIV in December 2019. After being diagnosed, she immediately started ART through Full Circle Health. She receives ART at no cost through the Ryan White/ADAP at Full Circle Health. She qualifies for this federal program because of her low income and inability to obtain health insurance.

35.     Because of her treatment, K.P. is undetectable. To be undetectable means that the amount of HIV in her body is so low that it does not show up on a lab test. Because her viral level is undetectable, she will not transmit HIV to someone who is HIV negative. Her medication protected her daughter while she was pregnant because it prevented her from transmitting HIV to her daughter during pregnancy.

36.     K.P. takes her ART medications every day. She receives a refill of her ART medications every 30 days. Her next refill is scheduled for July 8, 2025. She is required to re-enroll in the Ryan White/ADAP program every six months. Her most recent re-enrollment was in March 2025.

37.     If K.P. loses her medication because of H.B. 135, it would be devastating for her emotionally and physically. When she was diagnosed with HIV, she became very depressed. But with the medication, she felt better physically and better about life. She will become depressed again if she loses her medication. Her medication is everything. Her medication allows her to be with her daughter and watch her grow.

38.    If K.P. loses access to ART through Ryan White/ADAP, she cannot afford to pay for ART on her own.

39.    <u>PLAINTIFF N.R.</u> is an adult citizen of Colombia. He lives in Idaho with his wife, K.P. He and his wife have been together for fifteen years. They have a daughter who is a year and a half. Their daughter is a U.S. citizen.

40.    N.R. originally came to Idaho on a tourist visa in 2017 or 2018. He then returned to Columbia. In April of 2019, he and his wife both came to Idaho on a tourist visa. They have been residents of Idaho ever since. Their tourist visas expired because they stayed longer than the six months permitted by the visas. They came to Idaho because they have family here.

41.    N.R. works at a restaurant. He does not receive health insurance through his job. He does not have any health insurance. His wife does not have a job.

42.    N.R. applied for asylum in 2024. His asylum application remains pending. He has an EAD, which is a temporary work permit related to his asylum application. He is not a refugee, lawful permanent resident, or Green Card holder.

43.    N.R. fears that his asylum application and EAD are not sufficient to satisfy the immigration status verification requirements of H.B. 135. To complete the immigration status verification procedure, he must attest, under oath, that he is "lawfully present in the United States pursuant to federal law." He does not know whether the State of Idaho considers him to be lawfully present in the United States pursuant to federal law.

44.    H.B. 135 does not say whether his immigration status qualifies as lawful presence for purposes of the new law. The State of Idaho has not provided guidance on whether N.R.'s immigration status would satisfy the requirements. If he says that he is lawfully present, but the State of Idaho decides that he is not lawfully present, then he may be guilty of a misdemeanor.

45.    N.R. was diagnosed with HIV in December 2019. After being diagnosed, he immediately started ART through Full Circle Health. He receives ART at no cost through Ryan White/ADAP at Full Circle Health. He qualifies for this federal program because of his low income and inability to obtain health insurance.

46.    Because of his treatment, N.R. is undetectable. To be undetectable means that the amount of HIV in his body is so low that it does not show up on a lab test. Because his viral level is undetectable, he will not transmit HIV to someone who is HIV negative.

47.    N.R. takes his ART medications every day. He receives a refill of his ART medications every 30 days. His next refill is scheduled for June 30, 2025. He is required to re-enroll in the Ryan White/ADAP program every six months. His most recent re-enrollment was in March 2025.

48.    N.R. feels terrified that he may lose his medications because of the verification of immigration status requirements of H.B. 135. Losing his medications would be fatal for him. His medications are critical for him to be healthy and to thrive. He is also worried about everyone else in his community who will be harmed by having their medication, or the medication of their loved ones, taken away.

49.    If N.R. loses access to ART through Ryan White/ADAP, he cannot afford to pay for ART on his own.

50.    PLAINTIFF F.F. is a citizen of Peru. They are 36 years old. They live in Idaho with their family and partner. They arrived in Idaho in late 2022. They are gay and identify as male and non-binary.

51.    F.F. has a pending application for asylum. They are at risk of being unable to satisfy the verification requirements of H.B. 135 because they are otherwise undocumented.

52.     F.F. works in a restaurant and makes around $1,500 per month. They do not have health insurance through their job. They are unable to obtain any health insurance. They are taking English and Computer classes at a college in Idaho. Because of prior medical issues, unrelated to their HIV status, they have significant medical debt that they are unable to pay.

53.     F.F. was diagnosed with HIV ten years ago while living in Peru. They received their HIV diagnosis while they were hospitalized for hemophagocytic lymphohistiocytosis (HLH). HLH is a fungal infection that is rare, but often life-threatening, and caused by excessive immune activation. HIV can serve as a trigger for HLH. This was the case for them, as their undiagnosed HIV had suppressed their immune system.

54.     As soon as it was safe to do so, F.F. began ART to treat their HIV. Because of this treatment, they became undetectable. To be undetectable means that the amount of HIV in their body is so low that it does not show up on a lab test. Because their viral load is undetectable, they will not transmit HIV to someone who is HIV negative.

55.     F.F. takes their ART medications every day. Since January 2023, they have received ART at no cost through Ryan White/ADAP at Full Circle Health. They qualify for this federal program because of their low income and inability to obtain health insurance.

56.     F.F. receives a refill of their ART medications every 20 days. Their last refill was on June 24, 2025. They are required to re-enroll in the Ryan White/ADAP program every six months. Their most recent re-enrollment was in March 2025.

57.     When F.F. thinks of losing their medications because of the verification of immigration status requirements of H.B. 135, they feel scared, stressed, and anxious. Most of their family members will be unable to be with them or visit them in Idaho while their health declines. Their family will suffer as well knowing that they are losing medications that are keeping them alive.

58.     F.F. knows what will happen to their body if they lose access to their medication. It happened to them before in Peru when they were hospitalized for their HLH infection. They know that they will suffer from infections. They know that they will go to the hospital. They know that they will eventually contract AIDS. AIDS is the most advanced stage of HIV infection. And they will eventually die.

59.     There is no cure for HIV. Without treatment, it results in death.

60.     If F.F. loses access to ART, it will also put their partner's health and life at risk, as their partner is HIV negative. Because they are undetectable, they cannot transmit HIV to their partner. When they are no longer undetectable, their partner will be at risk of HIV transmission.

61.     If F.F. loses access to ART through Ryan White/ADAP, they cannot afford to pay for ART on their own. ART costs several thousand dollars per month. They only make $1,500 per month. Even if they qualify for discounted medications, the medications will still cost more than their monthly income.

62.     PLAINTIFF J.A.O.G. is an adult citizen of Mexico. He is a gay male. He lives in Idaho. He originally came to the United States when he was 4 years old. He spent a year in California and then his family moved to Idaho. They came to Idaho because they had family in Idaho who migrated here for agricultural employment, including the dairies and the fields.

63.     J.A.O.G. manages a restaurant. He does not receive health insurance through his job. He does not have any health insurance.

64.     J.A.O.G. is a recipient of Deferred Action for Childhood Arrivals ("DACA"). His DACA status expires in 2026. He is not an asylee, refugee, lawful permanent resident or Green Card holder. He fears that his DACA status is not sufficient to satisfy the immigration status verification requirements of H.B. 135.

65.     To complete the immigration status verification procedure, J.A.O.G. must attest, under oath, that he is "lawfully present in the United States pursuant to federal law." He does not know whether the State of Idaho considers him to be lawfully present in the United States pursuant to federal law.

66.     H.B. 135 does not say whether his immigration status qualifies as lawful presence for purposes of the new law. The State of Idaho has not provided guidance on whether his immigration status would satisfy the requirements. If J.A.O.G. says that he is lawfully present, but the State of Idaho decides that he is not lawfully present, then he may be guilty of a misdemeanor.

67.     J.A.O.G. was diagnosed with HIV in March 2024. He started ART through Full Circle Health in April 2024. He receives ART at no cost through Ryan White/ADAP at Full Circle Health. He qualifies for this federal program because of his low income and inability to obtain health insurance.

68.     Because of his treatment, J.A.O.G. is undetectable. To be undetectable means that the amount of HIV in his body is so low that it does not show up on a lab test. Because his viral level is undetectable, he will not transmit HIV to someone who is HIV negative.

69.     J.A.O.G. takes his ART medications every day. He receives a refill of his ART medications every 30 days. His next refill is scheduled for late July, 2025. He is required to re-enroll in the Ryan White/ADAP program every six months. His most recent re-enrollment was in May 2025.

70.     J.A.O.G. is very anxious that he will lose his ART because of the immigration status verification requirements of H.B. 135. He thinks about it every day. If he cannot access his

medications, he will lose weight, experience chronic cold/flu symptoms, loss of appetite, extreme fatigue. In the long-term, it is essentially a death sentence for him.

71.    If he loses access to ART through Ryan White/ADAP, he cannot afford to pay for ART on his own.

72.    <u>PLAINTIFF JOHN DOE</u> is an adult citizen of Mexico. He is not a U.S. citizen. He lives in Idaho. He has a wife and three children.

73.    John Doe most recently came from Mexico to Idaho in 2020. He came to Idaho for work so that he could provide for his family. His children are young, and he does not want them to struggle. He is undocumented. He does not have a visa, an asylum application or a work permit.

74.    John Doe works at two restaurants. He does not receive health insurance through his job. He does not have any health insurance.

75.    John Doe was diagnosed with HIV in September 2024. After being diagnosed, he immediately started ART through Full Circle Health. He receives ART at no cost through Ryan White/ADAP at Full Circle Health. He qualifies for this federal program because of his low income and inability to obtain health insurance.

76.    Because of his treatment, John Doe is undetectable. Because his viral level is undetectable, he will not transmit HIV to someone who is HIV negative.

77.    John Doe takes his ART medications every day. He receives a refill of his ART medications every 30 days. His next refill is scheduled for early July, 2025. He is required to re-enroll in the Ryan White/ADAP program every six months. He believes that his most recent re-enrollment was in March 2025.

78.    John Doe will not satisfy the immigration status verification requirements of H.B. 135 because he is undocumented.

79.    If John Doe loses his medication, he will die. He is very scared and anxious about slowly dying because of losing his medications. He worries for his children, because they need him to provide for them.

80.    If John Doe loses access to his ART through Ryan White/ADAP, he cannot afford to pay for ART on his own.

**B. Defendants**

81.    Defendant Alex Adams, PharmD, MPH, is the Director of IDHW, which administers federal public welfare programs in Idaho, including Ryan White/ADAP. He is sued in his official capacity.

82.    Defendant Miren Unsworth is the Deputy Director of IDHW in charge of Health & Human Services, which administers public services including Ryan White/ADAP. She is sued in her official capacity.

83.    Defendant Elke Shaw-Tulloch is the administrator of IDHW's Division of Public Health, and the State's public health officer. The Division of Public Health administers, among other programs, Ryan White/ADAP. She is sued in her official capacity.

84.    Defendant Angie Bailey is the Director of the Idaho Bureau of Rural Health & Primary Care. The Bureau has communicated with providers to inform them of verification requirements for the Ryan White program. On May 30, Defendant Bailey informed Plaintiff Dr. Davids that, "[p]er HB135, lawful presence will need to be verified for individuals applying to participate in ID ADAP unless an acute emergency arises." She is sued in her official capacity.

85.    Defendant Raúl Labrador is the Attorney General of Idaho, sued in his official capacity. The Idaho Attorney General is a proper defendant in a case challenging the enforcement of an Idaho statute. I.C. §§ 67-802(7), 67-1401(7); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376

F.3d 908, 920 (9th Cir. 2004); *Almerico v. Denney*, 532 F. Supp. 3d 993, 1001 (D. Idaho 2021).

Upon information and belief, the Idaho Attorney General's Office advised IDHW that it was

required by H.B. 135 to impose immigration status verification requirements on affected

programs, including Ryan White.

### STATEMENT OF FACTS

**A.  Legal Background: Comprehensive Federal Immigration and Public Benefits Systems**

86.      The federal government has exclusive power over immigration. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).

87.      State regulations that classify noncitizens or regulate the entry, movement, and residence of noncitizens in the United States are field preempted. *See Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 972 (9th Cir. 2017); *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1026 (9th Cir. 2013).

88.      In 1996, Congress enacted PRWORA, a landmark piece of legislation that drastically altered the availability of public benefits and social welfare programs across the United States. In PRWORA, Congress dedicated an entire section—codified at 8 U.S.C. chapter 14 – "RESTRICTING WELFARE AND PUBLIC BENEFITS FOR ALIENS."—to establishing the public benefits across all levels of government that are available to various noncitizen populations.

89.      PRWORA establishes categories for classifying "qualified" and "nonqualified" noncitizen populations. *See* 8 U.S.C. §§ 1641(b)-(c) (defining a "qualified alien" for purposes of public benefits eligibility).

90.      PRWORA includes provisions on how to verify citizenship. *See* 8 U.S.C. § 1642(a) (requiring the U.S. Attorney General to establish federal procedures for verifying that an

applicant is a qualified alien, for verifying that an applicant is a citizen, and for state and local governments to verify whether an applicant is a qualified alien, nonimmigrant, or paroled alien). The Act requires states to follow these verification procedures with respect to federal public benefits. *See* 8 U.S.C. § 1642(b) (requiring states that administer federal public benefits to establish a verification system that complies with the regulations). The Act exempts nonprofit organizations from being required to verify citizenship or immigration status. *See* 8 U.S.C. § 1642(d).

91.    PRWORA also establishes discrete categories of federal public programs, including federal public benefits, *see* 8 U.S.C. § 1611(c); specified federal programs, *see* 8 U.S.C. § 1612(a)(3); designated federal programs, *see* 8 U.S.C. § 1612(b)(3); federal means-tested public benefits, *see* 8 U.S.C. § 1613; and benefits under certain specified acts—including the acts creating WIC and the Commodity Supplemental Food Program ("CSFP"), *see* 8 U.S.C. § 1615. For each benefit category, PRWORA prescribes the availability of that benefit to different categories of immigrant as well as exempted benefits to be provided regardless of immigration status. *See, e.g.*, 8 U.S.C. §§ 1611(a) (federal public benefits available only to "qualified aliens"); 1611(b) (exempting categories of federal public benefits that remain available to nonqualified aliens).

92.    PRWORA also defines "state and local public benefit[s]," *see* 8 U.S.C. § 1621(c), and establishes that those benefits are available only to qualified aliens, non-immigrants and persons paroled into the U.S., except for exemptions outlined therein, and defined areas where states are permitted to determine access to benefits. *See* 8 U.S.C. §§ 1642(a); 1642(b); 1621(d); 1622; 1624(b).

93.     PRWORA establishes a complete and harmonious system governing immigrants'
eligibility for public benefits with no room for states to legislate outside of clearly defined areas.
*See, e.g.*, *League of United Latin Am. Citizens v. Wilson*, 997 F. Supp. 1244, 1255 (C.D. Cal.
1997).

**B.  Idaho H.B. 135**

94.     H.B. 135 takes effect on and after July 1, 2025.

95.     H.B. 135 requires immigration status verification for categories of federal public benefits
and state and local public benefits which are exempted from verification by PRWORA.

96.     The state statute, Idaho Code § 67-7903, previously reflected PRWORA's provisions
governing access to services within the categories of "federal public benefits," 8 U.S.C. § 1611,
and "state and local public benefits," 8 U.S.C. § 1621, based on immigration status.

97.     H.B. 135 amends Idaho Code § 67-7903 to remove exemptions to verification, effectively
requiring verification for services that are expressly exempted from verification by federal law.

98.     The statute requires status verification for applicants 18 years old or older who apply for
"federal public benefits" or "state or local public benefits" for themselves. Idaho Code § 67-7902
defines "federal public benefit[s]" and "state or local public benefit[s]" for the purpose of Idaho
Code § 67-7903 with reference to the federal statutory definitions. *See also* 8 U.S.C. §§ 1611(c),
1621(c).

99.     H.B. 135 removes provisions providing that Idaho Code § 67-7903 should be interpreted
according to federal law. It strikes the phrase "or where exempted by federal law." I.C. § 67-
7903(1). It also strikes the exemption "[f]or any purpose for which lawful presence in the United
States is not required by law, ordinance or rule[.]" *Id.* at § 67-7903(3)(a).

21

100.    H.B. 135 strikes exemptions from verification that are present in the federal statutes governing federal public benefits and state and local public benefits. It strikes an exemption for "public health assistance for immunizations with respect to immunizable diseases and testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease[.]" *See* I.C. § 67-7903(3)(d); *see also* 8 U.S.C. §§ 1611(b)(1)(C); 1621(b)(3). It also strikes an exemption for programs "such as soup kitchens, crisis counseling and intervention and short-term shelter specified by federal law or regulation[.]" *See* I.C. § 67-7903(3)(e); *see also* 8 U.S.C. §§ 1611(b)(1)(D); 1621(b)(4).

101.    H.B. 135 also amends Idaho Code § 56-203 to empower IDHW to establish requirements for lawful presence pursuant to § 67-7903.

### C.  Implementation of Idaho H.B. 135

102.    The Idaho Attorney General's office and IDHW have interpreted H.B. 135's amendments to require status verification for access to Ryan White assistance, WIC, CSBG funding, and CSFP.

103.    On April 16, 2025, IDHW informed Dr. Davids that H.B. 135 may require Ryan White/ADAP case managers to verify the immigration status of patients accessing HIV treatment through the program. IDHW confirmed that the agency would require status verification for people receiving treatment through the program on June 4, 2025. Dr. Davids is unable to "properly advise" her patients because she has no guidance from IDHW regarding the verification requirements, despite her requests. Dr. Davids is further unable to advise her patients regarding the verification requirements because she has "not been told by IDHW whether verification will be required on July 1, at the time of [patients'] next medication refill, at the time of their reenrollment, which occurs every six months, or only for new enrollees." She notes that

"[t]his lack of guidance on implementation makes it impossible for me and my patients to know when their medication will run out, which causes significant stress and anxiety for my patients and me." Dr. Davids further states that, "[]if my patients' medications are terminated, the virus [HIV] will quickly put [my patients] at a higher risk for infections, cancer, heart attacks, and strokes," and that "my patients will eventually be diagnosed with acquired immune deficiency syndrome ("AIDS") . . . , a chronic, life-threatening condition caused by HIV."

104.    The WIC program is a federally-funded program which provides free healthy foods, breastfeeding support, nutrition education, and health and community resources for pregnant people and their children under five years of age. On June 13, 2025, IDHW published guidance indicating that "Idaho Code requires applicants to present proof of lawful presence in the United States."

105.    The CSBG program is a federally-funded block grant that provides funds to support services that alleviate the causes and conditions of poverty in under-resourced communities, including housing, nutrition, utility, and transportation assistance; employment, education, and other income and asset building services; crisis and emergency services; and community asset building initiatives, among other things. IDHW has stated that verification of lawful presence will be required for CSBG programming.

106.    The CSFP program is a federally-funded program which works to improve the health of persons with low-income, at least 60 years of age, by supplementing their diets with nutritious USDA Foods. The state has indicated that verification will be required for CSFP assistance.

**D.  The Effect of H.B. 135 on Plaintiffs**

107.    The impacts of H.B. 135 on the Plaintiffs are described in the description of the parties above.

## CLASS ACTION ALLEGATIONS

108.     Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of other persons who are similarly situated.

109.     The class representatives K.P., N.R., F.F., J.A.O.G., and John Doe seek to represent a class of all current and future persons who will be unable to provide proof of immigration status sufficient to receive Ryan White funded services under IDHW's interpretation and implementation of H.B. 135, but who otherwise qualify for services through Ryan White.

110.     The proposed Class satisfies the requirements of Rule 23(a)(1) because the Class is so numerous that joinder of all members is impracticable. More than 60 noncitizens and individuals lacking access to documentation will be unable to provide verification of their immigration status sufficient to receive services. The proposed Class also includes numerous future individuals who are noncitizens and will become eligible for public services but will be unable to provide verification as required by H.B. 135.

111.     The proposed Class satisfies the commonality requirements of Rule 23(a)(2). The members of the Class are subject to a common verification requirement which prevents them from accessing services for which they otherwise qualify. The suit raises common questions, including whether H.B. 135, on its face and as implemented, is contrary to the Supremacy Clause, the Due Process Clause, and the Equal Protection Clause.

112.     The proposed Class satisfies the typicality requirements of Rule 23(a)(3), because the claims of the class representatives are typical of the claims of the Class. Each proposed Class member, including the class representatives, will experience the same principal injury (denial of access to federal services for which they are eligible), based on the same government practice

(imposition of verification requirements), which is unlawful as to the class based on its violation of the Supremacy Clause, the Due Process Clause, and the Equal Protection Clause.

113.    The proposed Class satisfies the adequacy requirements of Rule 23(a)(4). The class representatives seek the same relief as the other members of their Class—an order declaring H.B. 135 unlawful and an injunction preventing the law's immigration status verification requirement. The class representatives understand that they are bringing this lawsuit not only to protect their own interests, but also the interests of all the class members. They want to protect access to life-saving ART for themselves and others like them in Idaho. In defending their own rights, the class representatives will defend the rights of all proposed Class members fairly and adequately.

114.    The proposed Class is represented by experienced attorneys from the American Civil Liberties Union Foundation of Idaho, the National Immigration Law Center, Ramirez-Smith Law, and Nixon Peabody, LLP (collectively, "Proposed Class Counsel"). Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens, including cases asserting very similar claims to the claims asserted here.

115.    The proposed Class also satisfies Rule 23(b)(2). Defendants will act on grounds generally applicable to the Class by subjecting them to immigration status verification requirements and thereby barring their access to public services for which they otherwise qualify. Injunctive and declaratory relief is therefore appropriate for the Class as a whole.

**CLAIMS FOR RELIEF**

**Claim One: Preemption; Equity; 42 U.S.C. § 1983**

116.    Plaintiffs repeat and reallege all paragraphs above and incorporate them by reference as though fully set forth herein.

117.    The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."

118.    Federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

119.    H.B. 135 violates the Supremacy Clause because it attempts to regulate matters that are exclusively reserved to the federal government and because it operates in a field over which Congress has exercised exclusive authority.

120.    H.B. 135 further violates the Supremacy Clause because it conflicts with federal laws and denies federal funds to those eligible under federal law.

121.    Plaintiffs may sue to obtain injunctive relief against H.B. 135 in equity.

122.    Plaintiffs may sue to obtain injunctive relief against H.B. 135 pursuant to 42 U.S.C. § 1983 to protect their rights granted by federal law. *See Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 108 (1989).

**Claim Two: Due Process; Equity; 42 U.S.C. § 1983**

123.    Plaintiffs repeat and reallege all paragraphs above and incorporate them by reference as though fully set forth herein.

124.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

26

125.    Plaintiffs have a protected property interest and legitimate claim of entitlement to Ryan White benefits for which they would otherwise qualify.

126.    H.B. 135 regulates only "federal public benefits" and "state and local public benefits" as defined in federal law. Ryan White does not provide "federal public benefits" or "state and local public benefits" as defined in federal law. H.B. 135 therefore does not require immigration status verification for participation in Ryan White.

127.    IDHW, in consultation with the Idaho Attorney General's office, has instituted immigration status verification requirements for receiving Ryan White benefits, based on a mistaken interpretation of H.B. 135. The requirements include no notice and comment period, no hearings, and no grace period.

128.    Given the importance of these benefits to the Plaintiffs and the unavoidable harm that will result from a denial of benefits, procedural safeguards for instituting this change are required by Procedural Due Process.

129.    IDHW's decision to withdraw Ryan White benefits is independent from H.B. 135 and, without providing any procedural safeguards, violates Procedural Due Process.

130.    Plaintiffs may sue to obtain injunctive relief against H.B. 135 pursuant to 42 U.S.C. § 1983.

**Claim Three: Equal Protection; 42 U.S.C. § 1983**

131.    Plaintiffs repeat and reallege all paragraphs above and incorporate them by reference as though fully set forth herein.

132.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

27

133.    State laws that discriminate based on alienage which neither "correspond to any identifiable congressional policy" nor "operate harmoniously with the overall federal approach to immigration," are subject to heightened judicial scrutiny. *Sudomir v. McMahon*, 767 F.2d 1456, 1466 (9th Cir. 1985).

134.    H.B. 135 is in direct conflict with federal public benefits law. It does not operate harmoniously with the federal system. As such, it is subject to heightened judicial scrutiny.

135.    H.B. 135 cannot withstand heightened judicial scrutiny.

136.    A state's desire to "favor[ ] its own citizens over aliens in the distribution of limited resources such as welfare benefits[,]" is not a compelling state interest justifying a classification based on alienage. *See Graham v. Richardson*, 403 U.S. 365, 372, 374-75 (1971).

137.    An interest in expelling undocumented residents of a state would also fail to justify a classification based on alienage as this interest is field preempted and therefore not a legitimate interest for a state to pursue.

138.    H.B. 135 does not withstand heightened scrutiny and violates the Equal Protection Clause.

139.    Plaintiffs may sue to obtain injunctive relief against H.B. 135 pursuant to 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court grant the following relief:

a.  Declare that the imposition of immigration status verification requirements for Ryan White beneficiaries pursuant to I.C. § 67-7903 as amended by H.B. 135 are unlawful;

b. Preliminarily and permanently enjoin Defendants from enforcing immigration status verification requirements for Ryan White program beneficiaries pursuant to I.C. § 67-7903 as amended;

c. Require Defendants to direct their officers, agents, and employees to cease enforcement of immigration status verification requirements for Ryan White program beneficiaries pursuant to I.C. § 67-7903 as amended;

d. Grant Plaintiffs' costs of suit, reasonable attorneys' fees, and other expenses pursuant to 42 U.S.C. § 1988; and

e. Grant any other and further relief that this Court may deem fit and proper.

Dated: June 26, 2025                              Respectfully submitted,

                                                 */s/ Emily Myrei Croston*
                                                 Emily Myrei Croston (ISB No. 12389)
                                                 ACLU of Idaho Foundation