UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ABBY DAVIDS, M.D.; K.P.; N.R.; F.F.; J.A.O.G.; JOHN DOE; , <br><br> Plaintiffs, <br><br> v. <br><br> ALEX J. ADAMS, in his official capacity as Director of the Idaho Department of Health and Welfare; MIREN UNSWORTH, in her official capacity as the Deputy Director of IDHW in charge of Health & Human Services; ELKE SHAW-TULLOCH, in her official capacity as the administrator of IDHW's Division of Public Health; ANGIE BAILEY, as the Director of the Idaho Bureau of Rural Health & Primary Care; and RAUL LABRADOR, in his official capacity as the Attorney General of Idaho, <br><br> Defendants. | Case No. 1:25-cv-00334-AKB <br><br> **MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Provisional Class Certification (Dkt. 2). Plaintiffs include Abby Davids, M.D.; K.P.; N.R.; F.F.; J.A.O.G., and John Doe.[1] They seek injunctive relief to prevent the implementation and enforcement of Idaho House Bill No. 135 (H.B. 135) to the extent it imposes an immigration status verification requirement for benefits under the Ryan White Comprehensive AIDS Resources Emergency Act of 1990, 42 U.S.C. § 300ff, *et seq.*, and the

---

[1]    All Plaintiffs, but Dr. Davids, are identified in the complaint and other filings by pseudonyms and have filed a motion to proceed under those pseudonyms (Dkt. 4). That motion, however, is not yet ripe.

subsequent Ryan White HIV/AIDS Treatment Extension Act of 2009, Pub. L. No. 111-87, 123 Stat. 2885 (the Ryan White Program or the Program). The Ryan White Program provides medications to low-income people with the human immunodeficiency virus (HIV), who otherwise lack the means to obtain the treatment (Dkt. 2-1 at 8). Plaintiffs' motion is supported by their declarations (Dkts. 2-2, 2-8 – 2-12). Defendants[2] include Alex Adams, the Director of the Idaho Department of Health and Wealth (IDHW); IDHW's Deputy Director in charge of Health and Human Services, Miren Unsworth; IDHW's administrator of the Division of Public Health, Elke Shaw-Tulloch; the Director of the Idaho Bureau of Rural Health and Primary Care, Angie Bailey; and Raul Labrador, Idaho's Attorney General. Defendants oppose Plaintiffs' motion.

The Court entered a temporary restraining order (TRO) on June 30, 2025 (Dkt. 15), and it held a hearing on Plaintiffs' motion for a preliminary injunction and provisional class certification on July 15, 2025 (Dkt. 31). After that hearing, the Court extended the TRO under Rule 65(b)(2) of the Federal Rules of Civil Procedure on behalf of a provisional class (*id*). For the reasons discussed below, the Court grants Plaintiffs' motion for a preliminary injunction, provisionally certifies a class of Plaintiffs for this purpose,[3] appoints Plaintiffs' counsel as class counsel, and concludes no bond is required.

---

[2]     Plaintiffs sue all Defendants in their official capacities.

[3]     Plaintiffs separately filed a Motion for Class Certification, which was incorporated into the pending motion (Dkt. 3). The Court expedited briefing on the motion (Dkt. 16). At this stage, the Court's decision addresses only Plaintiffs' request for provisional class certification and considers Defendants' class arguments as opposing the provisional class certification (Dkt. 21). The Court defers a final decision on class certification.

MEMORANDUM DECISION AND ORDER - 2

## BACKGROUND

In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA or the Act), 8 U.S.C. § 1601, *et seq.* PRWORA restricts public benefits for "aliens"[4] based on a national policy that aliens should "not depend on public resources to meet their needs" and "the availability of public benefits [should] not constitute an incentive for immigration to the United States." *Id.* at § 1601(2)(A), (B). "To accomplish these objectives, [PRWORA] sets out a comprehensive set of eligibility requirements governing aliens' access to both federal and state benefits." *Korab v. Fink*, 797 F.3d 572, 580 (9th Cir. 2014).

PRWORA generally defines a "Federal public benefit" as "any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States" and "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(A).(B). Although not relevant here, PRWORA also establishes categories for state benefits. *Korab*, 797 F.3d at 575 (citing 8 U.S.C. §§ 1621, 1622).[5]

For purposes of allocating Federal public benefits, PRWORA creates two categories of aliens: qualified aliens and nonqualified aliens. The Act defines "qualified aliens" as "legal permanent residents, asylees, refugees, certain parolees, and aliens who fall within other limited categories specified in the statute." *Korab*, 797 F.3d at 575 (citing 8 U.S.C. § 1641(b), (c)). Only

---

[4]    Because PRWORA refers to "aliens," the Court likewise uses the term in its decision to avoid confusion.

[5]    The parties both acknowledge that benefits under the Ryan White Program at issue here are not state or local benefits (Dkt. 20 at 3, n.1; Dkt. 28 at 3).

**MEMORANDUM DECISION AND ORDER - 3**

qualified aliens are entitled to receive Federal public benefits; nonqualified aliens are not. PRWORA's general rule is that "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit." 8 U.S.C. § 1611(a).

PRWORA provides four exceptions to this general rule, however. Specifically, the Act provides that even an alien who is not "qualified" shall receive certain Federal public benefits, which include: (1) medical assistance for emergency medical conditions; (2) short-term, noncash, in-kind emergency disaster relief; (3) public health assistance for immunizations and the testing and treatment of communicable diseases; and (4) designated programs for the delivery of in-kind services at the community level for the protection of life and safety. 8 U.S.C. § 1611(b)(1)(A)-(D). At issue in this case is the third exception—namely, benefits for the treatment of a communicable disease. 8 U.S.C. § 1611(b)(1)(C).

The Ryan White Program is a federally funded program, which provides "critical medical care and medications to low-income people living with HIV who lack other means of obtaining treatment" (Dkt. 2-1 at 8). The Program's purpose is "to provide emergency assistance to localities disproportionately affected by the HIV epidemic and to make financial assistance available to develop, organize, coordinate, and operate a more effective and cost efficient system for the delivery of essential services to individuals and families with HIV." *AIDS Healthcare Found. v. Dep't of Pub. Health*, 17 Wash. App. 2d 2014 (2021) (unpublished), 2021 WL 1535452, at *1 n.1 (citing 42 U.S.C. § 300ff). The U.S. Department of Health and Human Services (HHS) provides funding and oversight for the Program. The State of Idaho receives three grants from the HHS for the Program, and the IDHW administers the Program at the state level by making subgrants to healthcare providers who treat eligible aliens (Dkt. 20 at 5-6).

In 2007, the Idaho Legislature adopted Idaho Code § 67-7903, which tracked PRWORA's eligibility requirements. Like PRWORA, § 67-7903 originally provided state agencies "shall verify the lawful presence" of a person applying for Federal public benefits. *Id.* at § 67-7903(1) (2007). Also like PRWORA, however, § 67-7903 provided exceptions to this verification requirement for the same four categories of Federal public benefits that PRWORA exempted from its qualified alien requirement. *Compare* 8 U.S.C. § 1611(b)(1)(A)-(D) *with* I.C. § 67-7903(3)(a)-(e) (2007). In other words, § 67-7903 did not require persons to verify their lawful presence in the United States to receive benefits "for [the] treatment of symptoms of communicable diseases," like the Ryan White Program.[6]

On April 3, 2025, however, Idaho's Governor signed H.B. 135,[7] which amends § 67-7903. This amendment, in part, deletes the reference to the receipt of benefits for the treatment of communicable diseases from the list of those benefits which do not require lawful presence verification. *Compare* I.C. § 67-7903(3) (2025) (deleting the exception "For public health assistance for immunizations with respect to immunizable diseases and testing and treatment of symptoms of communicable diseases . . . .") *with* I.C. § 67-7903(3)(d) (2007). Further, the amendment deletes references to federal law exemptions and other laws not requiring proof of lawful presence. *Compare* I.C. § 67-7903(1), (3) (2025) (deleting the exceptions "where exempted by federal law" and "For any purpose for which lawful presence in the United States is not required by law, ordinance or rule") *with* I.C. § 67-7903(1), (3)(a) (2007). Although the IDHW has not

---

[6]    The parties do not dispute that the Ryan White Program is a benefit for the treatment of communicable diseases (Dkt. 20 at 14 ("The Ryan White Program falls under the third exception, § 1611(b)(1)(C), regarding treatment of the symptoms of communicable diseases."); Dkt 28 at 3 (noting agreement)).

[7]    H.B. 135 became effective on July 1, 2025.

**MEMORANDUM DECISION AND ORDER - 5**

previously required lawful presence verification for the Ryan White Program, the IDHW indicated on April 16, 2025—shortly after the Governor signed H.B. 135—that it may require such verification, although it has allegedly failed to provide any specific guidance about this new requirement (Dkt. 1 at ¶¶ 15-17, 20-21).

On June 26, 2025, Plaintiffs filed this action challenging H.B. 135. Plaintiffs allege that "before H.B. 135, immigration status did not render patients ineligible" for benefits from the Ryan White Program but that under H.B. 135 they "will be unable to provide proof of immigration status sufficient to receive federally-funded [services]" under the Program (*id.* at 3; *id.* at ¶ 19). Based on these allegations, Plaintiffs assert claims for relief under the Supremacy Clause, the Due Process Clause, and the Equal Protection Clause (*id.* at ¶¶ 116-139). Plaintiffs assert all their claims under 42 U.S.C. § 1983; they also assert their Supremacy Clause and Due Process Clause claims in equity[8] (*id.* at 25-26; *id.* at ¶ 121).

On June 30, 2025, the Court entered a temporary restraining order (TRO) preserving the status quo by prohibiting Defendants from implementing or enforcing H.B. 135 to impose a lawful presence requirement on Plaintiffs for benefits under the Ryan White Program (Dkt. 15). Under Rule 65(b)(2), the Court extended this TRO until the issuance of this decision certifying a provisional class of Plaintiffs to include all current and future persons residing in Idaho who have been diagnosed with HIV and who would qualify for federally funded services through the Ryan White Program unless required to verify that they are qualified aliens for those benefits (Dkt. 31). Now, the Court preliminarily enjoins Defendants from implementing or enforcing H.B. 135 in the same manner against the provisional class.

---

[8]     In its TRO, the Court originally failed to note that Plaintiffs asserted their claims under the Supremacy and Due Process Clauses in equity and instead only noted their reliance on 42 U.S.C. § 1983 (Dkt. 2).

**MEMORANDUM DECISION AND ORDER - 6**

## ANALYSIS

### A. Right to Sue

To support their request for a preliminary injunction, Plaintiffs rely solely on their Supremacy Clause challenge that federal law preempts H.B. 135 (*see generally* Dkt. 2-1). As an initial matter, Defendants argue Plaintiffs have no private right of action to assert a preemption claim under the Supremacy Clause. Specifically, Defendants argue the Supreme Court's recent decision in *Medina v. Planned Parenthood S. Atlantic*, ___ U.S. ___, 145 S. Ct. 2219 (2025), "forecloses Plaintiffs' assertion of a private right of action under § 1983 for their preemption claim" (Dkt. 20 at 8).

In *Medina*, South Carolina announced Planned Parenthood "could no longer participate in the state's Medicaid program" "[c]iting a state law prohibiting the use of [the state's] public funds for abortion." *Id.* at 2227. A Planned Parenthood patient sued the director of South Carolina's Department of Health and Human Services under 42 U.S.C. § 1983, arguing that Planned Parenthood's exclusion from the program violated Medicaid's "any-qualified-provider provision." *Medina*, 145 S. Ct. at 2227. On appeal, the Supreme Court addressed whether "individual Medicaid beneficiaries may sue state officials [under § 1983] for failing to comply with one [Medicaid] condition." *Id.* at 2226.

The *Medina* Court noted that § 1983 provides a cause of action only for the deprivation of rights, privileges, and immunities and not for benefits or interests. *Medina*, 145 S. Ct. at 2229. The Court ruled that "to prove a statute secures an enforceable right, privilege, or immunity, and does not just provide a benefit or protect an interest, a plaintiff must show that the law in question clearly and unambiguously uses right-creating terms"; "the statute must display an unmistakable focus on individuals like the plaintiff"; and this test is "stringent and demanding." *Id.* (brackets and

quotations omitted). Further, the Court ruled that "whether a private party may sue to enforce the terms of a federal grant depends on whether the State voluntarily and knowingly consented to answer private claims as part of its bargain [for federal funding] with the federal government." *Id.* at 2232 (quotations omitted). Under these principles, the Court held that the Medicaid statute in question, 42 U.S.C. § 1396a, did not support a private right of action under § 1983 because it did not use "clear and unambiguous rights-creating language." *Medina*, 145 S. Ct. at 2236.

In reply to Defendants' reliance on *Medina*, Plaintiffs note they have and may bring their preemption claim in equity under the Supremacy Clause (Dkt. 1 at ¶ 121 (alleging Plaintiffs "may sue to obtain injunctive relief against H.B. 135 in equity"); Dkt. 28 at 3). At oral argument, Defendants disputed that Plaintiffs may proceed in equity without a private right of action. Both parties rely on the Supreme Court's decision in *Armstrong v. Exceptional Child Ctr, Inc.*, 575 U.S. 320 (2015), to support their contrary positions about whether Plaintiffs may assert a pre-enforcement preemption claim in equity under the Supremacy Clause absent a statutory private right of action.

In *Armstrong*, residential habilitation service providers sued Idaho officials, asserting Idaho reimbursed them at rates lower than § 30(A) of the Medicaid Act required, and the providers requested the district court enjoin Idaho to increase its rates. *Id.* at 323-24. On appeal, the Ninth Circuit ruled that the providers had an implied right of action under the Supremacy Clause to seek injunctive relief. *Id.* at 324. The Supreme Court reversed, however. *Id.* at 332. It noted that "the Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action." *Id.* at 324 (quotations and citations omitted). The Court also recognized, however, that it has "long held that federal court may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Id.* at 326.

Nevertheless, the *Armstrong* Court ruled that "the power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Id.* at 327. In other words, although a plaintiff may generally seek relief to enjoin a state's violation of a federal law, Congress may express or imply an intent to foreclose courts from enforcing a statute in equity. Regarding the statute at issue in *Armstrong*, the Court held that the providers could not sue in equity to enjoin Idaho because "§ 30(A) establish[ed] Congress's intent to foreclose equitable relief." *Id.* at 328. It explained that "the sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy . . . shows that the Medicaid Act precludes private enforcement for § 30(A) in the courts." *Id.* at 329.

Defendants argue that the *Armstrong* Court's statement that the Supremacy Clause does not create a private right of action forecloses Plaintiffs' preemption claim in equity in this case. This Court, however, does not read *Armstrong* to stand for the proposition that a plaintiff can never raise a challenge in equity that a federal law preempts a state law. Despite *Armstrong*, federal courts continue to entertain preemption challenges even absent a statutory private right of action. *See, e.g.*, *United States v. Texas*, 97 F.4th 268, 276 (5th Cir. 2024) (rejecting defendant's reliance on *Armstrong* to preclude injunctive relief and ruling "Texas cites to no constitutional or statutory provision that expressly or impliedly displaces an action arising in equity to enjoin executive action with regard to the matters at issue in this litigation"); *Farmworker Assoc. of Fla., Inc. v. Uthmeier*, No. 23-cv-22655-RAR, 2025 WL 1133682, at *4 n.6 (S.D. Fla. Apr. 17, 2025) (citing to "other courts [which] around the country have also uniformly held that plaintiffs may invoke a federal court's equitable jurisdiction to enjoin the enforcement of a preempted state law").

Here, unlike *Armstrong*, Defendants do not identify any statutory provision in PRWORA[9] which expresses or implies Congress' intent to prohibit Plaintiffs from pursuing a preemption claim in equity under the Supremacy Clause. Further, unlike *Medina*, Plaintiffs do not rely exclusively on § 1983 but also allege their claim in equity. Accordingly, at this stage, the Court rejects Defendants' argument that Plaintiffs may not seek injunctive relief under their Supremacy Clause claim.

### B. Preliminary Injunction

#### 1. Legal Standard

Under Rule 65, a party may obtain injunctive relief before a final judgment in certain limited circumstances. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). "Ordinarily, [preliminary] injunctions . . . may go no further than necessary to provide interim relief to the parties," and any equitable remedy must not be "more burdensome to the defendant than necessary to [redress] the plaintiff's injuries." *Labrador v. Poe by & through Poe*, ___ U.S. ___, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

A plaintiff seeking a preliminary injunction must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. The movant must carry this burden "by a clear showing." *Lopez v. Brewer*, 680 F.3d 1068,

---

[9]    Defendants argue that "the parallels between [the] Ryan White [Program] and the Medicaid Act are nearly exact. [The] Ryan White [Program] is also an exercise of Congress's spending power" (Dkt. 20 at 8). Plaintiffs' Supremacy Clause claim, however, asserts PRWORA, not the Ryan White Program, preempts H.B. 135. Moreover, PRWORA is not a spending power act but rather a welfare reform act. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1099 (9th Cir. 2012) (referring PRWORA as welfare reform act).

1072 (9th Cir. 2012). Courts must balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief. *Winter*, 555 U.S. at 24. When the government is a party, the factors regarding public interest and equities merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Courts in the Ninth Circuit apply a "sliding scale" standard, "allowing a stronger showing of one element to offset a weaker showing of another." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). Under this approach, an injunction is proper where "serious questions going to the merits" and a hardship balance "tips sharply toward the plaintiff." *Alliance for the Wild Rockies*, 632 F.3d at 1132; *see also N.D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024) (noting merits factor is "the most important" in court's analysis).

**2. Likelihood of Success on the Merits**

Plaintiffs argue that PRWORA preempts H.B. 135. Specifically, they argue it is preempted because PRWORA "establish[es] a complete system for determining immigrants' eligibility for public benefits," or alternatively, because "H.B. 135 presents an irreconcilable conflict with federal law where it purports to require verification for programs that are expressly exempt from [PRWORA's] verification requirements" (Dkt. 2-1 at 18, 21).

The Supremacy Clause provides that the Constitution, federal statutes, and treaties constitute "the supreme Law of the Land." Art. VI, cl. 2. The Clause provides "a rule of decision" for determining whether federal or state law applies in a particular situation. *Armstrong*, 575 U.S. at 324. If federal law "imposes restrictions or confers rights on private actors" and "a state law confers rights or imposes restrictions that conflict with the federal law," "the federal law takes precedence and the state law is preempted." *Murphy* v. *Nat'l Collegiate Athletic Assn.*, 584 U.S.

453, 477 (2018). "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012).

Here, Plaintiffs raise two preemption arguments: field preemption and conflict preemption. Under conflict preemption, state laws are preempted "when they conflict with federal law." *Arizona*, 567 U.S. at 399. A preemptive conflict occurs when "compliance with both federal and state regulations is a physical impossibility" or when "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotations omitted). The "conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress," *Kansas v. Garcia*, 589 U.S. 191, 202 (2020), not from a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011).

Under field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Field preemption occurs when a federal interest is "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" or when "a framework of regulation is so pervasive that Congress left no room for the States to supplement it." *Id.* "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.* at 401. "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.*

At least one federal district court has ruled that PRWORA establishes field preemption. In *League of United Latin Am. Citizens v. Wilson*, 997 F. Supp. 1244 (C.D. Cal. 1997), the court concluded that PRWORA "creates a comprehensive statutory scheme for determining aliens' eligibility for federal, state and local benefits and services"; Congress' intention "to occupy the

field of regulation of government benefits to aliens is declared throughout Title IV of [PRWORA]"; "[w]hatever the level of government extending the benefits and whatever the source of the funding for benefits—federal, state or local—they are all included within the expansive reach of [PRWORA]"; and PRWORA's provisions "both demarcate a field of comprehensive federal regulation within which states may not legislate and define federal objectives with which states may not interfere." *Id.* at 1251, 1253-54; *cf. Korab*, 797 F.3d at 581 ("Considering [PRWORA] as a whole, it establishes a uniform federal structure for providing welfare benefits to distinct classes of aliens. The entire benefit schedule flows from these classifications."); *see Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 605 (E.D. Va. 2004) ("[I]t does appear that Congress has preempted the field of determining alien eligibility for certain public benefits.").

The Court, however, does not need to reach the issue of whether PRWORA completely preempts the field of regulation governing public benefits for aliens. Rather, at this stage, the Court concludes Plaintiffs are likely to succeed on the merits of their conflict preemption argument. Namely, H.B. 135 directly conflicts with § 1611(b)(1)(C), which exempts benefits for the treatment of communicable diseases from PRWORA's qualified alien requirement. As a result, § 1611(b)(1)(C) preempts H.B.135's lawful presence requirement for such benefits. *Cf. Poder in Action v. City of Phoenix*, 506 F. Supp. 3d 725, 735 (D. Ariz. 2020) (noting defendant conceded conflict preemption between PRWORA and city program excluding unqualified aliens from receiving benefits excepted from qualified alien requirement under 8 U.S.C. § 1611(b)(1)).

One point of confusion that existed when Plaintiffs filed this action is whether the Ryan White Program confers a "Federal public benefit," as PRWORA defines that term. *See* 8 U.S.C. § 1611(c) (defining "Federal public benefit"). Although Plaintiffs acknowledge the Ryan White Program is a federally funded grant which ensures treatment for persons living with HIV (Dkt. 2-

1 at 8), Plaintiffs have taken the position that the Program's benefits are not Federal public benefits under PRWORA. They state "the U.S. Attorney General, in consultation with HHS, determined that Ryan White benefits are not Federal public benefits as defined under 8 U.S.C. § 1611(c)" (*id* at 11). In support, Plaintiffs rely on HHS's 1998 interpretation of the term "Federal public benefit." *See* Interpretation of Federal Public Benefit, 63 Fed. Reg. 41658 (Aug. 4, 1998) (1998 Notice). Plaintiffs also rely on the Department of Justice's (DOJ) 2001 Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation, 66 Fed. Reg. 3613-02 (Jan. 16, 2001) (2001 Final Order).

These authorities are somewhat confusing. HHS's 1998 Notice lists thirty-one programs and provides that "while all of these programs provide 'Federal public benefits[,]' this does not mean that all benefits and services provided under these programs are 'Federal public benefits.'" 63 Fed. Reg. 41658. Meanwhile, the DOJ's 2001 Final Order addresses the Attorney General's authority under 8 U.S.C. § 1611(b)(1)(D) to identify certain services to which PRWORA does not apply. 66 Fed. Reg. 3614. The Final Order notes that "many, if not all, HIV/AIDS-related services" are not likely to meet the criteria under § 1611(b)(1)(D) because such services are conditioned on "the client's income or ability to pay." 66 Fed. Reg. 3615; 8 U.S.C. § 1611(b)(1)(D)(ii).

Nevertheless, despite that the 2001 Final Order addresses only § 1611(b)(1)(D) and concludes HIV services, like the Ryan White Program, do not meet the criteria for that section, the Final Order relies on the Ryan White Program as an example. Specifically, the Final Order provides that "service providers and other interested parties should refer to benefit-granting agencies' interpretations of the term 'Federal public benefit'" and that, for example, "HHS advises the HHS programs under the Ryan White [Program] do not meet the statutory definition of 'Federal

**MEMORANDUM DECISION AND ORDER - 14**

public benefit' and therefore do not have to verify the citizenship or immigration status of applicants or recipients under PRWORA." 66 Fed. Reg. 3614.

Since Plaintiffs moved for a preliminary injunction, these authorities have changed. Namely, the DOJ has withdrawn its 2001 Final Order and HHS has revised its interpretation of "Federal public benefit" in its 1998 Notice. On July 10, 2025, HHS issued a revised notice interpreting the term "Federal public benefit" (2025 Notice) (Dkt. 30-1) (attaching 2025 Notice). HHS's 2025 Notice states its 1998 Notice "artificially and impermissibly constrains [the] statutory definition [of Federal public benefit] and the scope of PRWORA's effect" (Dkt. 30-1 at 5). Regarding PRWORA's exceptions to the qualified alien requirement, HHS's revised interpretation in the 2025 Notice states "the 1998 Notice *incorrectly* asserts that the 'exemptions' in § 1611(b)(1) 'excludes some HHS programs from the definition of Federal public benefits'" (Dkt. 30-1 at 6) (emphasis added). Rejecting its prior 1998 interpretation, HHS now states:

> While it is true that § 1611(b)(1) excludes certain HHS programs from the ambit of § 1611(a), it is false that those programs are excluded from the definition of "Federal public benefits." In fact, the statute clearly says the opposite. Paragraph (b)(1) says "Subsection (a) shall not apply with respect to the following Federal public benefits . . . "(emphasis added). Thus, "Public health assistance . . . for immunizations with respect to immunizable diseases and *for testing and treatment of symptoms of communicable diseases* whether or not such symptoms are caused by a communicable disease, 8 U.S.C. § 1611(b)(1)(C), *very much is a "Federal public benefit.*"

(Dkt. 30-1 at 17) (emphasis added). In other words, HHS's 2025 interpretation of Federal public benefit provides the Ryan White Program, which is a federally funded benefit for the treatment of a communicable disease, is a Federal public benefit.

On July 11, 2025, a day after HHS issued its 2025 Notice providing its new interpretation of a Federal public benefit, the DOJ withdrew its 2001 Final Order (Dkt. 32-1) (attaching recission order). This recission order states that the Attorney General in her discretion has concluded not to

except any benefits from PRWORA under § 1611(b)(1)(D), which provides for the Attorney General's discretion to except benefits meeting certain criteria from the qualified alien requirement (Dkt. 32-1 at 9). Further, the rescinding order provides that "this Order does not purport to define what benefit programs are and are not 'public benefits' subject to PRWORA. This Order *has no effect on other statutory eligibility requirements*, including those found in PRWORA" (*id.*) (emphasis added; citing § 1611(b)).

Based on these new authorities, the Court finds that it is likely—at this stage—that Plaintiffs can establish that § 1611(b)(1)(C) excludes the Ryan White Program from the qualified alien requirement. This conclusion is necessary because the Program provides public health assistance for the "treatment of symptoms of communicable diseases"; HHS's interpretation of Federal public benefits under its 2025 Notice now provides that "public assistance [for] treatment of symptoms of communicable diseases" is a Federal public benefit; and PRWORA provides that the qualified alien requirement in § 1611(a) "shall not apply" to Federal public benefits for the treatment of a communicable disease. 8 U.S.C. § 1611(b)(1)(C). Under this analysis, the Program is mandatorily exempt from PRWORA's qualified alien requirement.

As a result, H.B. 135 creates two direct conflicts. First, it removes the express acknowledgment in former Idaho Code 67-7903 that the lawful presence requirement did not apply if there was a relevant federal exemption. Because the Court finds that honoring PRWORA's exceptions is mandatory, H.B. 135's removal of that language creates an irreconcilable conflict. Any program in Idaho relying on an exception found in 8 U.S.C. 1611(b)(1)(C) would, at least facially, violate the current Idaho Code § 67-7903. Second, the requirement—according to the IDHW's interpretation—that persons must verify their lawful presence in the United States to receive benefits under the Ryan White Program directly conflicts with § 1611(b)(1)(C).

**MEMORANDUM DECISION AND ORDER - 16**

Compliance with both § 1611(b)(1)(C), which provides benefits for the treatment of communicable diseases *shall not* be subject to the qualified alien requirement, and with IDHW's interpretation of H.B. 135 to impose a lawful presence requirement for such benefits is "a physical impossibility." Further, H.B. 135 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of PRWORA to provide even nonqualified aliens with treatment for communicable diseases. *See Arizona*, 567 U.S. at 399 (ruling preemptive conflict occurs when "compliance with both federal and state regulations is a physical impossibility" or when "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress").

The Court is not presently persuaded by Defendants' arguments to the contrary. Defendants argue that the exception in § 1611(b)(1)(C) to the prohibition in § 1611(a) "is not a mandate" (7/15/2025 oral argument) (arguing "[a]n exception to a prohibition is not a mandate"). In other words, Defendants argue the State does not have to comply with PRWORA's objective in § 1611(b)(1)(C) of providing nonqualified aliens with benefits for the treatment of communicable diseases (*see also* Dkt. 20 at 2) (arguing PRWORA's "prohibition came with less than a handful of narrow exceptions that various levels of government could *choose* to offer or not."). In support, Defendants rely on three authorities.[10]

First, Defendants argue the Ninth Circuit's decision in *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020), supports their argument that PRWORA does not preempt H.B. 135. In that case, the plaintiffs challenged a high school's policy allowing transgender students to use restrooms, locker rooms, and showers matching their gender identity, rather than their biological

---

[10]    While opposing Plaintiffs' assertion that PRWORA preempts H.B. 135, Defendants note they are "[m]indful of federal immigration law and related case law" (Dkt. 20 at 22).

**MEMORANDUM DECISION AND ORDER - 17**

sex assigned at birth. *Id.* at 1217. Among other things, the plaintiffs argued the policy violated Title IX, 20 U.S.C. §§ 1681-1688. *Barr*, 949 F.3d at 1220. The plaintiffs argued that "Title IX unequivocally upholds the right to bodily privacy and therefore requires that facilities be segregated based on biological sex rather than gender identity." *Id.* at 1227 (quotations omitted).

In support, the plaintiffs noted that Title IX "provides [the statute] should not be construed to prohibit any educational institution from maintaining separate living facilities for different sexes and that Title IX's implementing regulations specifically authorize providing separate but comparable toilet, locker room, and shower facilities on the basis of sex." *Id.* (citations, quotations, and ellipses omitted). Rejecting this argument, the Ninth Circuit ruled that "just because Title IX authorizes sex-segregated facilities does not mean that they are required"; "[n]owhere does the statute explicitly state . . . schools may not allow transgender students to use the facilities that are most consistent with their gender identity"; and "Title IX does not specifically make actionable a school's decision not to provide facilities segregated by biological sex." *Id.* (quotations omitted).

PRWORA, however, is distinguishable from Title IX. Title IX authorizes certain conduct, namely maintaining separate living facilities, but under the Ninth Circuit's ruling in *Parents for Privacy* that authorization does not mandate separate living (or other) facilities. Meanwhile, PRWORA provides aliens must be qualified to be eligible for Federal public benefits except for certain benefits for which the qualified alien requirement "shall not apply." 8 U.S.C. § 1611(a), (b)(1). In other words, PRWORA arguably mandates both when the qualified alien requirement applies and when it does not apply. Defendants cite no court which has construed § 1611(b)(1)'s statement that the qualified alien requirement "shall not apply" to benefits for the treatment of communicable diseases to mean a state may choose not to follow § 1611(b)(1)'s directive. *See, e.g., Sierra Club v. Whitman*, 268 F.3d 898, 904 (9th Cir. 2001) ("It is true that 'shall' in a statute

generally denotes a mandatory duty."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 112 (2012) ("The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive . . . When drafters use *shall* and *may* correctly, the traditional rule holds—beautifully.") The Court finds no reason to depart from the "traditional rule" here that "shall not apply" means *must not apply*. *Id.*

Second, Defendants rely on the DOJ's 2001 Final Order. This Order addresses § 1611(b)(1)(D), which grants the Attorney General discretion to specify benefits (meeting certain criteria) as exempt from the qualified alien requirement.[11] 66 Fed. Reg. 3613-02. Specifically, they point to that Order's statement that:

> All programs and services covered by the Order are exempt from any requirement that verification be conducted, unless service providers are mandated to conduct such verification pursuant to federal, state, or local law other than the Welfare Reform Act . . . The services exempted by the Order are one of the several categories of services that were designated by Congress to remain available to all aliens regardless of their status as qualified or not qualified for welfare benefits. Accordingly, service providers are not obligated to verify immigration status before providing those services unless they are required to do so by law other than the Welfare Reform Act.

66 Fed. Reg. 3615.

Based on this language, Defendants assert the Attorney General's exemptions of certain benefits from the qualified alien requirement under § 1611(d)(1)(D) is a nonmandatory exception with which a state does not have to comply. From this assertion, they argue that "there's no reason that what's true of exception D wouldn't be true of C and A and B" (7/15/25 hearing). The Court

---

[11]    As the 2001 Final Order notes, services for HIV treatment generally do not meet the criteria under § 1611(b)(1)(D) because they are dependent on the recipient's income or resources. 66 Fed. Reg. 3615. Accordingly, § 1611(b)(1)(D) does not apply to the Ryan White Program because the receipt of benefits under that Program is dependent on the recipient's income (Dkt. 28-1 at ¶ 2 (noting IDHW administers Ryan White Program as "payor of last resort")).

**MEMORANDUM DECISION AND ORDER - 19**

disagrees. Section 1611(b)(1)(D) is fundamentally different from the other provisions in subsection (b)(1) because § 1611(b)(1)(D) grants the Attorney General discretion to except certain benefits from the qualified alien requirement. Section 1611(b)(1)(C), however, does not grant such discretion. Moreover, the DOJ has rescinded its 2001 Final Order, which does not grapple with the conflict between Congress designating categories of benefits to be available to all aliens regardless of their nonqualified statuses and yet allowing other laws to require status verification for those same benefits.[12]

Third, Defendant relies on HHS's 2025 Notice re-interpreting the term "Federal public benefit" (*see* Dkt. 30-1) (attaching 2025 Notice). Although the 2025 Notice "corrects" HHS's interpretation of this term, it also provides that HHS "is not formally revising the aspects of the 1998 Notice that touch on PROWRA's verification requirements" (Dkt. 30-1 at 19). Rather, regarding verification, the 2025 Notice emphasizes PROWRA's national policy of requiring aliens to be self-reliant. For example, the Notice provides that "the Executive Branch has made clear that it is the policy of this country that persons' access to public benefits should turn on those persons' immigration status" and that the current Administration has "issued numerous Presidential actions that reflect the will of the American people that aliens should not burden our public benefits system and that our public benefits system should not serve as a magnet for illegal immigration (*id.* at 20). Following HHS's emphasis on these Presidential actions, the Notice states that "even if PRWORA and related regulatory activity do not mandate an entity to conduct verification of the immigration status of a person applying for benefits, nothing in the statute prohibits such an entity from conducting verification" (*id.* at 20-21).

---

[12]    At the time Defendants relied on the DOJ's 2001 Final Order, they did not know the DOJ had rescinded it.

Defendants argue this latter statement means § 1611(b)(1)'s directive that the alien qualification requirement "shall not" apply to Federal public benefits for the treatment of communicable diseases is not a mandate. Arguably, Defendants may be correct about HHS interpreting "shall not" to be permissive, not mandatory. Notably, however, HHS's statement is conclusory. HHS does not provide any reasonable interpretation of PRWORA to support its position that § 1611(b)(1) is not a mandate. Indeed, HHS does not provide any analysis to support its position. Absent a more fulsome explanation and analysis, HHS's purported interpretation is not persuasive. *See Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)) (noting agency's interpretation may be persuasive depending on thoroughness of consideration, validity of reasoning, and consistency); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 399 (2024) (rejecting the premise that courts "mechanically afford binding deference to agency interpretations" of a statute). Presently, this Court declines to adopt an interpretation of § 1611(b)(1)(C) as nonmandatory. Accordingly, the Court concludes Plaintiffs are likely to succeed on the merits of their claim that § 1611(b)(1)(C) directly conflicts with and preempts H.B. 135's lawful presence requirement for the receipt of benefits under the Ryan White Program.

### 3.  Irreparable Injury

The Court also concludes Plaintiffs have shown they are likely to suffer irreparable harm. Plaintiffs argue that the loss of benefits under the Ryan White Program for their treatment for HIV "will allow for the universally fatal progression of the disease to AIDS and increase their risk for infections, cancer, heart attacks, and strokes, including highly deadly infections like pneumocystis, pneumonia, cryptococcal meningitis, Kaposi sarcoma, mycobacterium avium complex, cytomegalovirus, toxoplasmosis, and visceral leishmaniasis" (Dkt. 2-1 at 22-23) (citing Dkt. 2-2

at ¶¶ 39-40). Further, they argue the Ryan White Program is their only means to obtain their necessary treatment.

In support, Plaintiffs have submitted Dr. Davids' declaration attesting that the cost of treatment for an individual with HIV is over $4,200 a month and that the Program is "a payer of last resort," meaning Plaintiffs "must affirmatively prove the absence of all other coverage to qualify" for the Program. (Dkt. 28 at 12) (citing Dkt. 28-1 at ¶¶ 1-4, 11-14). Additionally, Plaintiffs have submitted their own declarations attesting they have no other means to pay for their treatment (*id.* (citing Plaintiffs' declarations). This evidence is sufficient to establish a likely irreparable injury. *See M.R. v. Dreyfus*, 663 F.3d 1100, 114 (9th Cir. 2011) (noting Ninth Circuit has "several times held that beneficiaries of public assistance may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care") (quotations omitted; citing cases), *amended on other grounds*, 697 F.3d 706 (9th Cir. 2012); *see also Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 997 (N.D. Cal. 2010) ("[T]he reduction or elimination of public medical benefits is sufficient to establish irreparable harm to those likely to be affected by the program cuts.").

Defendants' arguments to the contrary are unpersuasive. First, Defendants argue that "Plaintiffs have not alleged they have no other source of pay, free, or reduced-cost treatment" and that Plaintiffs "have other options" such as "pay[ing] for the medical care themselves" or "seek[ing] other sources of funding, such as charitable or medical organizations" (Dkt. 20 at 18-19). Defendants, however, submit no evidence that these alternatives are available or viable, and their argument ignores both that the Ryan White Program is a "payor of last resort" (Dkt. 28-1 at ¶ 2) and Plaintiffs' sworn statements that they are unable to fund their treatment.

Second, Defendants argue Plaintiffs "always have the ability to comply with U.S. immigration law and return to their native countries to obtain treatment" (Dkt. 20 at 18). In support, they note Mexico, Columbia, and Peru provide "public," "universal," or "affordable" healthcare options (*id.* at n.9, n.10). Defendants' suggestion that Plaintiffs leave the country for treatment is not feasible, however, for the reasons Plaintiffs identify including, for example, that some Plaintiffs allegedly fled persecution (Dkt. 28 at 13).

### 4. Balancing Equities and Hardships

Finally, the Court concludes the balance of equities and hardships favor Plaintiffs. When the government opposes a preliminary injunction, "the third and fourth factors of the preliminary injunction test—balance of equities and public interest—merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). The balance of equities inquiry concerns the plaintiffs' burdens or hardships compared to the defendants' burden if the court orders the injunction. *Id.* Meanwhile, the public interest mostly concerns the injunction's impact on nonparties. *Id.*

Here, the record establishes Plaintiff will likely suffer severe hardship if they are unable to maintain their Ryan White Program benefits for HIV treatment—including potentially fatal consequences. In contrast, Defendants do not identify any specific hardship (*see generally* Dkt. 20 at 19). Rather, they rely exclusively on the public interest factor, identifying two public interests. First, they argue "there are limited grant funds and every dollar that goes to pay for treatment for an alien who is not eligible is a dollar that is not available to pay for treatment for someone who is eligible for the grant funds" (*id.*). In support, they submit the sworn statement of Angie Bailey, the Chief of IDHW's Bureau of Healthcare Access that "to the extent the subgrant funds and medication funds were to be used for treatment of persons who are not eligible for the assistance

under [H.B. 135], there could have been much less assistance available for eligible persons" (Dkt. 20-1 at ¶ 9). Defendants, however, offer no evidence that eligible persons are not receiving benefits because purportedly ineligible persons are receiving them instead. Absent evidence that eligible persons cannot receive benefits under the Ryan White Program because of a lack of funding, Defendants' public interest argument is speculative.

Second, Defendants rely on the "the compelling government interests" which PRWORA identifies of assuring aliens are self-reliant and of removing the availability of public benefits as an incentive for illegal immigration (*id.*) (citing 8 U.S.C. § 1601(5), (6)). In contrast to this public interest, however, the Ninth Circuit has recognized a "robust public interest in safeguarding access to health care." *M.R.*, 697 F.3d at 738; *see also Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1177 (N.D. Cal. 2009) (noting robust public interest in safeguarding access to healthcare). Indeed, PRWORA also appears to recognize the same public interest in providing access to healthcare for the treatment of communicable diseases by excepting benefits for that purpose from the qualified alien requirement. 8 U.S.C. § 1611(b)(1)(C). Because the HIV treatments Plaintiffs receive under the Ryan White Program prevent the transmission of HIV, this public interest extends not just to aliens but to the population in general (*see* Dkt. 2-2 at ¶¶ 43-45) (discussing increased HIV transmission absent treatment). This universal public interest and the significant hardship Plaintiffs face weigh in favor of granting a preliminary injunction.

In summary, Plaintiffs have raised serious questions on the merits of their preemption claim and established the likelihood of irreparable harm. Further, the balance of equities and hardships favor preserving the status quo. Accordingly, the Court grants Plaintiffs' motion for a preliminary injunction.

### C. Provisional Class Certification

#### 1. Legal Standard

Having concluded Plaintiffs satisfy the requirements under Rule 65 for a preliminary injunction, the Court must determine the scope of that injunction. For this purpose, Plaintiffs request the Court provisionally certify a class of Plaintiffs under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. Plaintiffs' proposed class includes "[a]ll current and future persons who otherwise qualify for federally funded services through the Ryan White Program but will be unable to provide proof of immigration status sufficient to receive federal Ryan White services" (Dkt 3-1 at 7).

A trial court has broad discretion regarding whether to grant a motion for class certification. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). Courts routinely grant provisional class certification for purposes of entering injunctive relief. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041-43 (9th Cir. 2012) (affirming provisional class certification for purposes of a preliminary injunction); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 (9th Cir. 2020) (same).

Rule 23(a) requires the parties seeking class certification to affirmatively demonstrate the proposed class meets four threshold requirements: (1) numerosity—the class is so large that joinder of all members is impracticable; (2) commonality—one or more questions of law or fact is common to the class; (3) typicality—the named parties' claims are typical of the class; and (4) adequate representation—the class representatives will fairly and adequately protect the interests of other class members. Fed. R. Civ. P. 23(a); *Sali v. Corona Regional Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018). A district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores,*

*Inc. v. Dukes*, 564 U.S. 338, 351 (2011). This "rigorous" evaluation, however, is not a mini-trial. *Sali*, 909 F.3d at 1004. "A district court need only consider material sufficient to form a reasonable judgment on each [Rule 23] requirement," and "[t]he court's consideration is not limited to only admissible evidence." *Id.* at 1005.

If Rule 23(a) is satisfied, then a class action may be maintained under Rule 23(b)(2) when the party opposing certification "has acted . . . on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) has been utilized most frequently in class actions seeking injunctive relief. WRIGHT & MILLER, 7AA FED. PRAC. & PROC. CIV. § 1775 (3d ed.) It is described as "uniquely appropriate procedure in civil-rights cases, which generally involve an allegation of discrimination against a group as well as the violation of rights of particular individuals." *Id.* at § 1776. The requirements of Rule 23(b)(2) "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) (citation omitted).

## 2. Numerosity

Numerosity requires a showing that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement is not a fixed numerical threshold but rather requires an examination of the specific facts of each case. *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010); *see also General Tel. Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 330 (1980) (providing numerosity requirement demands "examination of the specific facts of each case"). "Plaintiffs must show some evidence of or reasonably estimate the number of class members. Mere speculation as to satisfaction of this numerosity requirement does not satisfy

Rule 23(a)(1)." *Schwartz v. Upper Deck Co.,* 183 F.R.D. 672, 681 (S.D. Cal. 1999). Generally, courts presume numerosity is satisfied when there are forty or more members in the proposed class. *Rannis*, 380 F. App'x at 650-51. Conversely, the Supreme Court has noted a class of fifteen "would be too small to meet the numerosity requirement." *General Tel. Co. of the Northwest,* 446 U.S. at 330 (explaining numerosity imposes "no absolute limitations").

Here, for purposes of estimating the number of class members, Plaintiffs rely on Dr. Davids' declaration. Dr. Davids attests that her clinic serves approximately forty-five HIV patients who are "fully undocumented" and twenty or more patients who may be unable to satisfy H.B. 135's lawful presence requirement—depending on the parameters of that requirement (Dkt. 2-2 at ¶¶ 11-15). Defendants argue this information is insufficient to satisfy the numerosity requirement because "reliance on a single clinic's data, without statewide evidence, does not demonstrate impracticable joinder" and because Dr. Davids' declaration "lacks specificity about how many of the 65 individuals will be unable to meet H.B. 135's verification requirements" (Dkt. 21).

Defendants' arguments are without merit. Dr. Davids identifies more than forty HIV patients who are "fully undocumented" and for that reason will be unable to satisfy H.B. 135's lawful presence requirement—whatever that might be. That the remaining twenty might or might not be able to satisfy the requirement does not defeat the numerosity of over forty patients who certainly will not be able not meet the requirement. Further, the record indicates IDHW has four subgrant agreements for the Ryan White Program with clinics other than Dr. Davids' clinic (Dkt. 20-1 at ¶ 6). At this early stage, Plaintiffs have not had the opportunity to discover and produce evidence about those other clinics' patients. At least some of them are likely

undocumented and will not be able to meet H.B. 135's law presence requirement. If so, then the class's numerosity will increase. Accordingly, Plaintiffs have provisionally shown numerosity.

### 3. Commonality

Commonality requires the plaintiffs "to show that there are questions of law or fact common to the class" (Dkt. 41 at 5) (citation omitted). *Wal-Mart*, 564 U.S. at 349. The Supreme Court has ruled that commonality requires the plaintiffs to "demonstrate that the class members have suffered the same injury," not merely the violation of "the same provision of law." *Id.* at 349-50. "What matters to class certification is not the raising of common questions . . . but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (quotations, ellipses omitted). The plaintiffs' claims must "depend upon a common contention such that determination of their truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Parsons*, 754 F.3d at 675 (quotation omitted). The plaintiffs "need not show, however, that every question in the case, or even a preponderance of questions, is capable of class-wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement." *Id.* (quotation omitted).

Here, Plaintiffs will suffer the same injury under H.B. 135's lawful presence requirement. Namely, each will be denied benefits under the Ryan White Program because they cannot establish their lawful presence in the United States. The common answers to the legal questions of whether PRWORA preempts H.B. 135 or whether H.B. 135 violates the Due Process or Equal Protection Clauses will resolve the litigation. That Plaintiffs have "diverse immigration statuses," as Defendants note, does not undermine commonality. The common question is whether the lawful presence requirement unconstitutionally deprives Plaintiffs' benefits under the Ryan White

Program. Defendants cannot defeat this common question by imposing the requirement but at the same time refusing to identify the requirement's parameters. Accordingly, Plaintiffs have provisionally shown commonality.

### 4. Typicality

Considerations underlying commonality and typicality often overlap considerably, such that they "tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Rule 23(a)(3) provides that one or more class members may sue as a representative of all the members if the representative's claims are typical of the members' claims. The named representative's claims are "typical" if they are "reasonably coextensive with those of absent class members." *Parsons*, 754 F.3d at 685. They need not be "substantially identical," however. *Id.*; *see also DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024). A representative "is not typical if there is a danger that absent class members will suffer if their representative is preoccupied" with issues unique to the representative. *DZ Rsrv.*, 96 F.4th at 1238 (quotation omitted).

Here, the representatives' claims are typical of the class members. Each representative is an alien, has been diagnosed with HIV, is receiving benefits under the Ryan White Program, will likely be subject to H.B. 135's lawful presence requirement to continue receipt of those benefits, and will suffer significant injury because they cannot satisfy the requirement. Conceivably, the IDHW could define the lawful presence requirement to eliminate certain class representatives' claims if, for example, it concludes a temporary work permit and asylum application are adequate to establish lawful presence. Even in that event, however, other undocumented class representatives have typical claims because they cannot satisfy a lawful presence requirement under their circumstances, and certification requires only one proper class representative. *See*

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009) (noting only one class representative required).

### 5. Adequacy

Rule 23(a)(4) requires that the representatives "fairly and adequately protect the interests of the class." This requirement serves both "to uncover conflicts of interest between the named parties and the class they seek to represent" and "the competency and conflicts of class counsel." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 n.20 (1997). The adequacy inquiry addresses two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (quotations and internal citation omitted). "Where there are multiple proposed class representatives, a court need only find that one is an adequate class representative." *J.N. v. Oregon Dep't of Educ.*, 338 F.R.D. 256, 273 (D. Or. 2021) (citing *Rodriguez*, 563 F.3d at 961).

In appointing counsel, the court must consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B); *see also id.* 23(g)(2) (court may appoint applicant as class counsel "only if the applicant is adequate under Rule 23(g)(1) and (4)"); *id.* 23(g)(4) ("Class counsel must fairly and adequately represent the interests of the class.").

Defendants appear to challenge counsel for Plaintiffs, arguing "Plaintiffs have not offered evidence that shows the named representatives' ability to manage the case or address the conflicts with class members who have different risks and defenses" (Dkt. 21 at 7). The Court disagrees. Four counsel for Plaintiffs submitted declarations detailing their experience and qualifications to represent Plaintiffs in this case (Dkts. 3-2 – 3-5). Based on this information, the Court concludes Plaintiffs' counsel are adequate representatives in this case.

Defendants also challenge Plaintiffs as adequate representatives because their "desire to proceed in pseudonym raises concerns over credibility and fear of disclosure, which could affect adequacy" (Dkt. 21 at 7). Defendants, however, fail to cite any supporting authority or otherwise elaborate why these factors make Plaintiffs inadequate class representatives. Accordingly, the Court concludes Plaintiffs have satisfied the adequate representation requirement.

### 6. Rule 23(b)(2)

Finally, Defendants argue Plaintiffs fail to meet Rule 23(b)(2)'s requirement because their request for relief "is not uniform" (Dkt 21 at 7). In support, they argue the case "may involve individualized damages, not just injunctive relief" (*id.*). Contrary to this assertion, however, Plaintiffs have not alleged or otherwise sought damages but instead have specifically denied they will seek monetary damages. Accordingly, the Court concludes Plaintiffs satisfy Rule 23(b)(2)'s requirement that their requested injunctive relief is appropriate respecting the whole class. *See Parsons*, 754 F.3d at 688 (ruling Rule 23(b)(2) requirements "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole").

Because Plaintiffs have satisfied the requirements of Rule 23 at this stage, the Court provisionally grants class certification for purposes of a preliminary injunction and appoints Plaintiffs' counsel as counsel for the provisional class.

### D. Bond

Plaintiffs argue that the Court should waive the bond requirement under Rule 65(c) of the Federal Rules of Civil Procedure because they would otherwise effectively be denied relief given their meager means (Dkt. 2-1 at 26). Indeed, by design, the only persons who can receive the benefits of the Ryan White Program are in poverty. Meanwhile, Defendants argue "there is a plain justification for an injunction bond" because Plaintiffs will receive benefits from the Program while litigation is pending in lieu of someone who is "eligible" for those benefits. As previously noted, however, Defendants have failed to provide any evidence that Plaintiffs are receiving benefits in lieu of "eligible" persons. Moreover, Defendants make no showing of any costs they will incur because of the injunction. Accordingly, the Court finds that no bond is necessary and waives the requirement. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented*, 236 F.3d 1115 (9th Cir. 2001) ("Absent any showing by defendants of cost, we cannot say the district court clearly abused its discretion in determining the bond amount.").

### ORDER

Accordingly, the Court hereby ORDERS:

1. Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Provisional Class Certification (Dkt. 2) is **GRANTED**.

   a. The Court certifies the provisional class to include all current and future persons residing in Idaho who have been diagnosed with HIV and who could qualify for

federally funded services through the Ryan White Program unless required to verify they are qualified aliens for those benefits.

2.  The Court enjoins Defendants and their officers, agent, employees, attorneys, and any person who is in active concert or participation with them from implementing or enforcing H.B. 135 to impose immigration status verification requirements on Patient Plaintiffs for benefits under the Ryan White Program.

3.  The Court appoints counsel for Plaintiffs as counsel for the provisional class.

4.  The Court waives the bond requirement under Rule 65(c) of the Federal Rules of Civil Procedure.

DATED: July 24, 2025

Amanda K. Brailsford
U.S. District Court Judge